# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL MCKINNON,

        Petitioner,

vs.                    Docket No.: 1:CR-03-251-05

UNITED STATES OF AMERICA,

        Respondent.

_____/

## PETITIONER'S REPLY TO GOVERNMENT OPPOSITION TO TITLE 28 U.S.C. § 2255

COMES NOW, Petitioner Michael McKinnon, with this his reply to the Government's opposition to the Title 28 U.S.C. § 2255 and in support provides as follows:

## TABLE CONTENTS

A. Counsel was Ineffective for Failing to Interview and Call Michel Raisbek to the Defense of the Case ............................................................................ 1

B. Counsel was Ineffective by Failing to Object Based on the Confrontation Clause the Admission of the Marijuana Lab Report and Results .......................... 11

C. Counsel Rendered Ineffective Assistance when he Failed to Present for Appeal a Separate Confrontation Clause Issue when the Trial Court Limited the Cross Examination of Shawn Sheppard that Would Have Established that Petitioner Could Not Have Known There a Crime Being Committed ................... 14

D. Appellate Counsel Did Render Ineffective Assistance by Failing to Attack the Money Laundering Conviction in Light Of Supreme Court's Decision in *Cuellar v. United States,* 553 U.S. 550 (2008) ...................................................................... 17

E. Counsel was Ineffective for Failing to Request Sequestration of the Witnesses.......................................................................................................... 24

F. Appellate Counsel was Ineffective for not Challenging the Sufficiency of the Evidence to Support Defendant's Conviction for Distribution of Crack Cocaine ..   28

G. Counsel was Ineffective for Failing to Object to an Obstruction of Justice Enhancement that did Not Apply to Petitioner's Case.............................................   29

H. Counsel and Appellate Counsel Rendered Ineffective Assistance by Failing to Contest the Presentence Investigation Report Office Enhancement for Reckless Endangerment While Fleeing Law Enforcement at the Time that the Alleged Officers were Following Petitioner ...........................................................................   32

Conclusion ...............................................................................................................   38

Certificate of Service ...............................................................................................   38

## TABLE OF AUTHORITIES

*Baumann v. United States*, 692 F.2d 565 (9th Cir. 1982) ........................ ...........34

*Blackledge v. Allison*, 431 US 63 (1977) ........................................... 12, 34

*United States v. Plitman*, 194 F.3d 59 (2nd Cir. 1999) ........................... 12

*Crane v. Kentucky*, 476 U.S. 683 (1986) ..................................... 7

*Davis v. Alaska*, 415 U.S. 308 (1974) ....................................... 16

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ...................................... 15

*Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990) ......................................... 11

*Holmes v. South Carolina*, 547 U.S. 319 (2006)...................................... 7

*Ingram v. United States*, 360 U.S. 672 (1959) ......................................... 14

*Machibroda v. United States*, 368 US 487 (1962) ................................ 5, 34

*Moffet v. Kolb*, 930 F.2d 1156 (7th Cir. 1994)....................................... 11

*Nichols v. United States*, 75 F.3d 1137 (7th Cir. 1996) .......................... 35

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ............................... 8

*Scott v. United States*, 349 F.2d 641 (6th Cir. 1965) ........................... 5, 10

*Shaw v. United States*, 24 F.3d 1040 (8th Cir 1994)................................ 35

*Stoia v. United States*, 22 F.3d 766  (7th Cir. 1994) ............................... 35

*United States v. Acklen*, 47 F.3d 739  (5th Cir. 1995)............................... 11

*United States v. Antzoulatos*, 962 F.2d 720 (7th Cir. 1992)............................ 17, 22

*United States v. Belletiere*, 971 F.2d 961 (3rd Cir. 1992)....................................... 28

*United States v. Brodie,* 403 F.3d 123 (3rd Cir. 2005) ........................................... 14

*United States v. Burrows,* 872 F.2d 915  (9th Cir. 1989)....................................... 10

*United States v. Butt,* 731 F.2d 75 (1st Cir. 1984) ........................................... 10, 34

*United States v. Cabral-Castillo,* 35 F.3d 192 (5th Cir. 1994).............................. 31

*United States v. Campbell,* 977 F.2d 854 (4th Cir. 1992)...................................... 18

*United States v. Cartwright,* 359 F.3d 281 (3rd Cir. 2004) ................................... 15

*United States v. Chandler,* 326 F.3d 210 (3rd. 2003) ........................................... 16

*United States v. Crooker,* 729 F.2d 889 (1st Cir. 1984)................................... 12, 34

*United States v. Falcone,* 311 U.S. 205 (1940)...................................................... 14

*United States v. Frigeiro-Migiano,* 254 F.3d 30 (1st Cir. 2001) ........................... 18

*United States v. Gray,* 878 F.2d 702 (3rd Cir. 1989)............................................... 8

*United States v. Hayes,* 135 F.3d 435 (6th Cir. 1997) ........................................... 32

*United States v. Idowu,* 157 F.3d 265 (3rd. Cir. 1998) .......................................... 14

*United States v. Kapp,* 781 F.2d 1008  (3rd. Cir. 1986)......................................... 15

*United States v. Kautman,* 995 F.2d 884 (7th Cir. 1992)....................................... 22

*United States v. Kelly,* 790 F.2d 130 (DC Cir. 1986)............................................... 5

*United States v. Lovett,* 964 F.2d 1029 (10th Cir. 1992) .................................. 19, 22

*United States v. Martin,* 264 Fed. Appx. 857 (11th Cir. 2008).............................. 31

*United States v. Martinez-Medina,* 279 F.3d 105 (1st Cir. 2002)..................... 18, 19

*United States v. Marzgliano,* 588 F.2d 395 (3rd Cir. 1978)................................... 34

*United States v. Nguyen,* 565 F.3d 668 (9th Cir. 2008) .......................................... 15

*United States v. Shoff,* 151 F.3d 889 (8th Cir. 1998) .............................................. 19

*United States v. Sykes,* 4 F.3d 697 (8th Cir. 1993)................................................... 31

*United States v. Thomas,* 114 F.3d 225 (3rd Cir. 2006).......................................... 15

*United States v. Unger,* 665 F.2d 251  (8th Cir.1981) ............................................ 34

*United States v. White,* 366 F.3d 291 (4th Cir. 2004) ............................................... 5

*United States v. Witherspoon,* 231 F.3d 923 (7th Cir. 2000)................................... 35

*Virgin Islands v. Weatherwax,* 20 F.3d 572  (3rd Cir. 1994)................................... 34

*Washington v. Texas,* 388 U.S. 14 (1967).................................................................. 8

## A. COUNSEL WAS INEFFECTIVE FOR FAILING TO INTERVIEW AND CALL MICHEL RAISBEK TO THE DEFENSE OF THE CASE

As a threshold matter, the government improperly takes the defense position that petitioner cannot show on the record that Michel Raisbek was even involve in the case nor that she even dialed 911 on the day in question. Their position in defense to the argument is flawed by several respects. Not only does the record support that Ms. Raisbek was a critical defense witness, but documentation that was in counsel's possession and in the government's possession supports the position that her testimony was critical to the defense. As presented in Appendix A to this reply, the 911-incident report prepared on September 25, 2003 established that Michelle Raisbek contacted the 911 operator as the vehicle drove towards the construction site being followed by the law enforcement. She unequivocally stated to the 911 operator that there was a third unknown vehicle that threw the alleged drugs out of a small vehicle, *__after petitioner's and the DEA's vehicles drove by the scene.__* (See Appendix A) The following transmission between the 911 operator and the complaining witness occurred:

| 9/25/03 09:30 | RNGRIF CT | Two dark gray vans chasing each other. |
| 9/25/03 09:30 | RNCGRIF CT | Poss. some kind of road rage LS on Interstate 83 northbound. |
| 9/25/03 09:30 | JTMCCO ET | M/C another erratic driver just came through driving. |
| 9/25/03 09:30 | JTMCCO CT | *__A small vehicle – just threw a bag out of their vehicle.__* |

9/25/03 09:31   JTMCCO CO   POSS.  Act 64 inside the bag.

9/2/503 09:32   JTMCCO CO   Would like an officer to come take a look.

*Id.* (Appendix A)

Furthermore, during the trial, the government presented the testimony of

Agent Cunney that testified during redirect examination that he had in fact

heard of Ms. Raisbek:

> By Ms. Fawcett:
>
> Q.  Do you know who Michelle Raisbek is?
>
> A.  No.
>
> Q.  Do you recall interviewing individuals that were making telephone calls with respect to what had occurred at the construction site just after the incident with Shawn Sheppard?
>
> A.  Yes, I do.
>
> Q.  What was those individuals Michelle Raisbek?
>
> A.  Yes.
>
> Q.  ***Did you speak with Michelle Raisbek?***
>
> A.  ***I did.***

(See Appendix B)

The government was aware of Michelle Raisbek's exculpatory testimony

regarding the small vehicle that allegedly threw the drugs out of the window

while driving erratically through the construction site, and failed to bring to the court's or defense counsel's attention she [Michelle Raisbek] actually the witnessed the incident and called 911 presenting to the government that an additional third party vehicle, not involving petitioner, threw the drugs out the window. The fact that not only counsel failed to present or investigate this witness, but also the Government failed to present her exculpatory testimony.

In fact, petitioner refers this court the "Additional Supporting Documents" submitted to the DEA Office of Processional Responsibility where he presented what Michelle Raisbek stated on the call report the notes that two vans were chasing each other and then another erratic driver in a small vehicle threw a bag out of their vehicle. (See Appendix C) Ms. Raisbek obviously was the only witness who could identify where the bag came from yet she was not called to testify for the government or as a defense witness." This document, that was in the government's possesion, supports the position that not only did the government know that Michelle Raisbek was the individual who could have testified that an unrelated third party threw the drugs out of the vehicle and not petitioner.

The government's position that petitioner cannot present what testimony if any Michelle Raisbek would have presented to the jury, is premature at best. Should this court grant an evidentiary hearing to determine the extent of Michelle Raisbek's information, the court will have the luxury of first hand

hearing from Michelle Raisbek's the testimony as to which vehicle threw the marijuana in the construction site. It has clearly been shown according to the 911 reports that were in the government's along with the redirect testimony of the DEA agent in this case, that they everyone was aware of Michelle Raisbek's exculpatory testimony but they chose to either withhold the information. At this point, the government's position that "assuming counsel did not interview her" is nothing more than self-serving speculation at best. The government has failed to secure any documentation whatsoever from defense counsel as to why Michelle Raisbek was not contacted, interviewed or why her testimony was not presented. There is a reasonable doubt as whether the government purposely withheld Michelle Raisbek's testimony and contact information, or whether counsel failed to contact and interview Michelle Raisbek. Absent a full-blown evidentiary hearing addressing the matter, this court cannot accept the government's version of any trial strategy counsel may have as testimony in lieu of holding an evidentiary hearing. Sworn or unsworn testimony of an AUSA may not be considered as a substitute for an evidentiary hearing. *See Machibroda v. United States,* 368 US 487 (1962)(AUSA's sworn statement cannot defeat the right of an evidentiary hearing) *Scott v. United States,* 349 F.2d 641 (6th Cir. 1965); *United States v. White,* 366 F.3d 291 (4th Cir. 2004)(AUSA's unsworn statements are not evidence); *United States v. Kelly,* 790 F.2d 130 (DC Cir.

4

1986)(unsworn statements by AUSAs may not be used as a substitute for an evidentiary hearing in connection with a post conviction motion)

In fact, sworn or unsworn statements by counsel cannot defeat the right to an evidentiary hearing, if one is secured. See *Scott v. United States,* 349 F.2d 641 (6th Cir. 1965) (attorney's affidavit is not conclusive evidence justifying summary judgment against a petitioner in a 2255 motion). In the instant matter, the Government has failed to secure an affidavit from trial counsel as to the allegations raised in the Title 28 U.S.C. § 2255.

Furthermore, the government's position that nothing before the record supports defendant's assertion that the DEA agent was aware that Ms. Raisbek had seen the incident is also misleading. The 911 call reports which were in the government's possession during the preparation of this trial establishes that Michelle Raisbek was the third individual who called 911 on the day of the incident telling the 911 operator that a small vehicle had thrown marijuana out of the window.

In hindsight, irrespective of the government's position that petitioner was driving the vehicle being chased through the construction zone, does not discredit that it was not petitioner's vehicle that threw the marijuana out of the window. As this court will remember, the defense strategy during the trial was that petitioner was being chased by an unknown marked van and was under the position that the individuals were not law enforcement officers. As previously presented in this case, it is well established from the record

that petitioner was driving a dark van, which was also verified by the DEA's testimony during the trial as to their pursuit of petitioner.  (TR. 68-69; 96 at 2125; 987 at 1-5)  Contrary to the government's claims in the response, petitioner is not now, nor has ever claimed not to have been the driver of the dark van involved in the incident in question.  The fact that an unrelated vehicle not involved in this case threw the marijuana out of the window through the construction site, would have shed some doubt into the jury's perception of petitioner's involvement in the instant offense as far as the possession of marijuana charges concerned.  The credibility of Jennifer Cassel could have been challenged by the mere fact that Michelle Raisbek would have testified that it was an unknown vehicle hat was actually involved in throwing the marijuana out of the window and not petitioner's vehicle itself.

Finally, the government's position that petitioner's sister Tawana McKinnon provided an affidavit stating that petitioner apologized to the agents for the incident of driving through the construction site does not address whether it was petitioner's vehicle or petitioner specifically who threw the marijuana out of the vehicle during the chase.  The fact that a chase occurred through the construction site is not being contested.  The issue presented in the Title 28 U.S.C. § 2255 was not whether petitioner drove through the construction site, but was whether petitioner was actually involved in the throwing the marijuana out of the vehicle.  The mere fact that Michelle Raisbek was available to testify and should have been interviewed

by defense counsel as a critical defense witness to this case is an issue of ineffective assistance of counsel that requires a holding of an evidentiary hearing.

Finally, the government's position that Michelle Raisbek's testimony would have unlikely created a reasonable doubt as to the truthfulness of testimony of the four DEA agents or the construction workers is also a self-serving statement. All that petitioner is required to prove was a "reasonable doubt" whether his vehicle was the one that threw the marijuana out of the construction site. And in light of Michelle Raisbek's testimony, enough of a "reasonable doubt" as to petitioner's involvement has been established. Had counsel followed up with the witness and secured her testimony it is unknown what the outcome would have been. However, based on the "reasonable doubt" expectation there is that fine line opportunity that Michelle Raisbek's testimony could have created sufficient doubt to petitioner's involvement in the throwing the marijuana off the construction site. There is no documentation in the court's file that supports the position that any of the defenses raised by the government as tactical or trial strategies were counsel actual strategies that wanted to pursue.

The Fifth Amendment guarantees the right to present a meaningful defense and the Sixth Amendment guarantees the right to compulsory process. *See Holmes v. South Carolina,* 547 U.S. 319 (2006); *Crane v. Kentucky,* 476 U.S. 683 (1986). When viewed together, the Fifth and Sixth

7

Amendments guarantee the defendant the right to put before the jury, all evidence that might influence the determination of guilt. See *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987); *Washington v. Texas,* 388 U.S. 14 (1967)(the right to offer the testimony of a witness ... is in plain terms is the right to present a defense, right to present a defendant's version of the facts...the accused has a right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.)  See also *United States v. Gray,* 878 F.2d 702 (3rd Cir. 1989).

Ironically, all of the testimony of all the government agents involved only bolsters petitioner's position.  The testimony of the government witness Steve Warren and Jack Boyer, the other two callers in the 911 call report, testified that neither one of them saw a small vehicle throw a bag of marijuana with a possible act 64 inside and neither one of the them made statements to that effect to law enforcement.  (TR. 97-98; 102 at 6-13; 111-112)  None of the testimony proffered from any agent, testified that they witnessed petitioner's vehicle or any other vehicle throw any bag of marijuana out of the window. Therefore, irrespective of all the witnesses that testified relating to this incident, not one of the witnesses either law enforcement or otherwise, could have testified that they observed ***petitioner's vehicle*** throw any bag of marijuana out the window.  (TR. 57 at 13-17; 71-72; 986, 987, 1053)

Also, the government's position that Michelle Raisbek's testimony might not have altered the outcome of this count is contrary to prior case law.  The

court in *Interstate Circuit, Inc. v. United States,* 306 U.S. (1939) stated: "the production of the weak evidence when strong is available can lead only to the conclusion that the strong would have been aversed." The government by choosing to call Mr. Warren and Mr. Boyer to testify could have also called Michelle Raisbek. The admission of the bag of marijuana into evidence indicated a direct connection between petitioner and the drugs. The fact that this marijuana in the bag was actually permitted to be shown to the jurors adds to prejudicial affect. (Government Exhibits 200; 201) Michelle Raisbek's testimony would have created substantial doubt. *Leyva v. Williams,* 2009 US Dist. LEXIS 112872 (3rd Dist.)(a reasonable probability is that the probability sufficient to undermine confidence in the outcome of the proceedings. The "reasonable probability" standard requires less than preponderance of the evidence.)

Furthermore, had counsel taken the opportunity to investigate the case, he would have become aware that petitioner was carrying a black briefcase when exiting 308 Hummel Avenue, the morning he attempted the arrest not a bag. (See affidavit for search warrant made out by S.A. Andrew Cunney of the Harrisburg DEA, dated September 25, 2003)  (See Appendix F) It is obvious from the record that counsel was aware of the 911 call report (TR. 31-32) of which detailed Ms. Raisbek's name, address, and phone number.  It is also obvious on the line of questioning that petitioner's trial counsel was aware that Ms. Raisbek retained credible testimony that corroborated a

plausible defense theory. (TR. 97; 98 at 17-21; 102 at 6-13; 108-111; 986-987) (See also trial counsel's motion in limine attempting to exclude the bag of marijuana on the basis that it could not be linked to the defendant).

Absent any affidavit from counsel to the contrary, this court must agree that counsel's actions were not based on any technical considerations but merely on his lack of due diligence. See *Melendez v. United States,* 2006 U.S. Dist. LEXIS 9699 (3rd Dist.)  The allegations, if accurate, would grant Petitioner relief and warrant an evidentiary hearing.  In fact, there are no documents before the Court that conclusively contradict what Petitioner is stating. See *United States v. Butt,* 731 F.2d 75 (1st Cir. 1984).  Rather, all the allegations that are before the District Court, relate to incidents and occurrences which occurred outside of the court's based on counsel's failure to prepare.  There is no support on the record that the alleged faults raised in the Title 28 U.S.C. § 2255, were attributable to any trial strategy.

Nor are there any documents or pleadings before the District Court which would shed light into counsel's defense to the issues raised, if any.  See *Scott v. United States,* 349 F.2d 641 (6th Cir. 1965) All that is before the Court is the Government's "defenses" and their version of defenses to the allegations raised without more. The Government was not a party to counsel's preparations.  They cannot take a position on the matter without securing counsel's position on the allegations via an affidavit for this pleading.  There is a reason why the Government did not secure an affidavit from trial counsel,

quite possibly, because trial counsel actually supports Petitioner's position. Without the benefit of an evidentiary hearing, the Court cannot make a determination on the allegations that are *not supported* by the record of the case.   See, *See United States v. Burrows*, 872 F.2d 915, 918-919 (9th Cir. 1989)(record must *"conclusively"* demonstrate strategic nature of counsel's actions); *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)(reviewing court should "*not construct strategic defenses which counsel does not offer*")(citing *Kimmelman v. Morrison*, 477 U.S. at 386); *Moffet v. Kolb*, 930 F.2d 1156, 1160-61(7th Cir. 1991); *United States v. Acklen,* 47 F.3d 739, 743-44 (5th Cir. 1995)(remanding for evidentiary hearing where there was nothing in record to indicate counsel's failures were attributable to strategic choice among all plausible alternatives available for defense).

    **WHEREFORE**, this court must agree that counsel's failure to introduce Michelle Raisbek's testimony warrants the granting of an evidentiary hearing.

## B. COUNSEL WAS INEFFECTIVE BY FAILING TO OBJECT BASED ON THE CONFRONTATION CLAUSE THE ADMISSION OF THE MARIJUANA LAB REPORT AND RESULTS

    Once again, the government attempts to interject their opinion or belief as to counsel's strategy for not challenging the introduction of the marijuana laboratory reports.  They take the position that "there is no reason to suspect that trial counsel here effectively stipulated to the drug test results for any different reason." *Id.* As previously presented herein, unless the government

can secure any documentation for counsel as to his strategy why he did not pursue one avenue or the other in the defense of petitioners' case, the government cannot speculate or present an avenue that counsel himself does not offer. The Courts have determined that an evidentiary hearing is required since Petitioner's statements as presented in the District Court were not "inherently incredible." *See United States v. Crooker,* 729 F.2d 889 (1st Cir. 1984). Nor were the statements neither "conclusory in nature nor unsupported by specifics." *Blackledge v. Allison,* 431 US 63 (1977).

Furthermore, notwithstanding the fact that the agents secured the discarded "green vegetable substance" as suspected marijuana from the scene of the construction area, it still fails to link petitioner to the possession or involvement with the marijuana. By merely stipulating to the contents, counsel failed to permit the Sixth Amendment confrontational right to challenge the actual substance contained in the bag. This court should note, that based on the argument presented herein, that there is a serious doubt that petitioner was involved with the marijuana. Stipulating to a laboratory report containing lab results that relate to marijuana that petitioner was not involved with, it extremely prejudicial. Counsel should have never stipulated to a laboratory test of an unknown drug, especially when there is evidence to the contrary to prove petitioner's non-involvement with that drug.

The Court *United States v. Plitman,* 194 F.3d 59 (2nd Cir. 1999) has clearly addressed that "counsel in a criminal case may waive the client's

Sixth Amendment right of confrontation by stipulating to the admissions of evidence, so long as the defendant does not descent from the attorney's decision...." In the instant case, petitioner never had the opportunity to descent or express his opinion based on counsel's actions. Counsel ***took it upon himself*** to make a determination on the stipulation of the laboratory reports regarding the marijuana. In fact, once again the government takes the position that counsel had a tactical strategy or that counsel addressed the matter with petitioner and petitioner never descended to the same. There is just no factual documentation before this court to reach any determination on any tactical decision that counsel may or may not have taken during this trial absent (1) an affidavit from counsel addressing the same; or (2) an evidentiary hearing where counsel can present the tactical reasons, if any, before this court.

Any reference to tactical choices or defense tactics that the government presents that counsel used or relied upon to prepare or defend petitioner's carries no weight as to the issues raised. There is no documentation before this court that would support government's position that counsel followed any strategical choices whatsoever in preparing petitioner's case or in stipulating to the laboratory reports in the pretrial stages of the case. Speculation on the government's part is all that is available.

In sum, the mere fact that petitioner was present during the trial when the laboratory reports were admitted through the testimony of Agent Andrasi,

does not diminish counsel's lack of performance in his failure to stipulate as to the admission of the lab report.

**C. COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PRESENT FOR APPEAL A SEPARATE CONFRONTATION CLAUSE ISSUE WHEN THE TRIAL COURT LIMITED THE CROSS EXAMINATION OF SHAWN SHEPPARD THAT WOULD HAVE ESTABLISHED THAT PETITIONER COULD NOT HAVE KNOWN THERE WAS A CRIME BEING COMMITTED**

The law is clear that one cannot commit to or agree to acts that constitute a crime without _knowing_ that the person or defendant was actually committing a crime. *See United States v. Brodie,* 403 F.3d 123 (3rd Cir. 2005) (government must prove that the defendant had knowledge of the facts that constitute the offense and the elicit purpose of the conspiracy); *United States v. Idowu,* 157 F.3d 265 (3rd. Cir. 1998)(the government is obligated to prove beyond a reasonable doubt that the defendant had knowledge of a particular illegal objective contemplated by the conspiracy.)   In petitioner's case, according to the government's facts, the alleged objective or purpose of the conspiracy was to launder drug dealer's money. So in essence, petitioner and his co-conspirators had to possess the _"knowledge or purpose"_ that they were "laundering drug proceeds." See *Bryan v. United States,* 524 U.S. at 193 (knowingly, merely requires proof of knowledge of the facts that constitute the offense.)   Additionally, a conspiracy conviction requires that "at least a degree of criminal intent be necessary for the substantive offense itself." *Ingram v. United States,* 360 U.S. 672 (1959).  The core of conspiracies is an agreement to commit an unlawful act. See *United States v. Falcone,* 311 U.S.

14

205 (1940).  None of those requirements could have been settled without further confronting the witness.

Witness Sheppard, testified he never openly sought anyone, never got the word out, that if you have money we will launder it. (TR. 497)  His testimony only established that he had no idea that any money laundering was occurring. (TR. 497-498)  Thus, how could there have been a possibility that the purpose or intent to launder drug proceeds or join the conspiracy to do the same ever existed. *See United States v. Brown*, 2009 U.S. Dist. LEXIS, 39682 (3rd Dist.)(the element of conspiracy ... *i.e.*, combined with intent to commit the underlying offense); *United States v. Kapp*, 781 F.2d 1008, 1010 (3rd. Cir. 1986)(combined with intent to commit the underlying offense); *United States v. Cartwright*, 359 F.3d 281 (3rd Cir. 2004)(the alleged conspirators must share a unity of purpose, the intent to achieve a goal and an agreement to work together towards that goal).  This requires the conspirator to have "knowledge" of the "specific objective of the conspiracy." *Id.* at 286-87; *United States v. Thomas*, 114 F.3d 225 (3rd Cir. 2006)

There is no claim by the government in their response brief, that the evidence would have mislead the jury, confuse the issues, or been cumulative at best.  The only rationale given by the government for their exclusion of Sheppard's testimony is that of the relevance as to the charged offense.  What more effective or relevant cross examination could there be, other than an alleged co-conspirator, government informant who was a material witness for

15

the government whose testimony was absolutely essential to the government's case, who was prepared to testify in earnest that he had no knowledge that a conspiracy to launder money was ever occurring. See *United States v. Nguyen*, 565 F.3d 668 (9th Cir. 2008)(money laundering is a specific intent crime. Simply, confrontation clause error occurs at admission of a testimonial statement without an opportunity to cross-examine that witness. ) *Id.* at 541 U.S. 68-69

A criminal defendant's right to confront witnesses is a fundamental right essential to a fair trial is guaranteed by the Sixth Amendment confrontation clause. See *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). Under the Sixth Amendment Confrontations Clause, the District Court must allow effective cross-examination of the witnesses. *See Davis v. Alaska*, 415 U.S. 308, 317 (1974)("we have recognized that the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross examination.)

It has become abundantly clear from the record that Sheppard, the government witness, did not possess the knowledge that any money laundering was occurring, nor the intent to commit the act itself. Thus, if counsel was allowed to further question Sheppard, counsel would have gotten the crux to his motivations for testifying, his bias, or his incentive to lie. There is an independent inquiry under the confrontation clause that requires that the defendants be "permitted to expose the jury the facts from which

jurors could appropriately draw inferences relating to the reliability of the witness." Davis, 450 U.S. at 318.  See also *United States v. Chandler,* 326 F.3d 210 (3rd. 2003)(limiting cross examination as to witness's motive for testifying against the defendant violated the confrontation clause.)

Accordingly, this court must agree that appellate counsel had before it, an obvious Sixth Amendment confrontation clause violation that should have been presented on appeal for proper review.  There is a strong possibility that had the confrontation clause been presented for appellate review, that the court would have vacated petitioner's conviction based on the Sixth Amendment right to confront Sheppard on his obvious intent to testify, and would have allowed Sheppard to testify and prove to the jury petitioner's non involvement in the offense.  The sole reason the government chose to object to Sheppard's testimony was because Sheppard's testimony would have clarified to the jury that petitioner could not have *"knowingly"* being involved in the charged offense of money laundering.

**D.  APPELLATE COUNSEL DID RENDER INEFFECTIVE ASSISTANCE BY FAILING TO ATTACK THE MONEY LAUNDERING CONVICTION IN LIGHT OF SUPREME COURT'S DECISION IN *CUELLAR V. UNITED STATES,* 553 U.S. 550 (2008)**

In order for there to be a conviction for money laundering, there has to be an intent or purpose to disguise the money's source.  In petitioner's case, there was no intent or purpose to disguise the source of the money whatsoever as per the evidence presented during the trial.  In *Cuellar v. United States,* 553 U.S. 550 (2008) the court held "concealment under 1956

17

statute 'requires' that an _intent_ to conceal a transaction which involves more than merely hiding the contraband." See also _United States v. Richardson,_ 2010 U.S. Dist. LEXIS 90081 (E.D. PA.)(Since the money laundering statute is intended to punish the intentional concealment of illicit proceeds and not just the spending of the proceeds, a conviction must be supported by "proof that the purpose and not merely the affect of the transaction was to conceal or disguise the funds.")

In petitioner's case, it is paramount as the merchant of a retail car industry that he has knowledge of the source and the intent to commit money laundering as alleged in the transactions. See _United States v. Antzoulatos,_ 962 F.2d 720 (7th Cir. 1992)(presumably it will be sufficient when the merchant "personally observes the unlawful activity" and sees being used to buy goods from him. It is also presumably sufficient if the buyer says directly to the merchant, "this money is tainted." More problematic is asking the merchant to rely on the word of third persons who may or may not be believable. Also problematic is permitting the merchant to rely on the appearance of a buyer, or in the presence of unexplained wealth.); _United States v. Campbell,_ 977 F.2d 854 (4th Cir. 1992); United _States v. Frigeiro-Migiano,_ 254 F.3d 30 (1st Cir. 2001); _United States v. Martinez-Medina,_ 279 F.3d 105 (1st Cir. 2002).

In this case, the government heard no testimony from any alleged drug dealers or in the government exhibit number 28 or otherwise that would lend

any notion to believe that they intended to launder any of their drug proceeds through petitioner. (TR. 497 at 7-17; 669-698; 710-738; 803-827; 829-858; 861-891). Sheppard testified he never openly sought to launder any money and that he was not there to do anyone any favors. (TR. 497 at 20-25; 502 at 8-14). There is no testimony that any transaction reported requirement forms were needed, besides the transactions including Mr. Holt, who witness Sheppard and witness Smith testified was not a drug dealer. In fact, Smith's testimony also established that he was responsible for the filing of the forms and that he had all of the intentions in doing so. (TR. 651 at 11-25; 625 at 1-9). In fact to this Petition, this Court will find the affidavits of Raymond Jones and Kenneth Henderson addressing that there were no intentions to launder money. (See Appendix D)

The statutes legislative history confirms that more than mere "suspicion" is required on the merchant's part. The provision contained the "reason to know" and "reckless disregard" standards; was replaced in response to concerns raised by several witnesses during hearings on the Bill. S. Rep. 433, 99 Cong. 2nd Sess. 6-8 (1986). The report continued by presenting that the "knowing" scienter requirements are intended to be construed like existed "knowing" scienter requirements, to include the instances of "willful blindness." *Id.* An automobile dealer who sells a car at market rates to a person, who he merely suspects of involvement with crime, cannot be convicted of this offense in the absence of showing that he knew something

19

more about the transaction or the circumstance's creating and surrounding it. *Id.* at 9-10.[1]

In fact, in *United States v. Shoff,* 151 F.3d 889 (8th Cir. 1998) the court held that "of course it is not unusual for a car dealer to require payment and guaranteed funds before delivering the vehicle." See *United States v. Lovett,* 964 F.2d 1029 (10th Cir. 1992). Therefore, intent to conceal from dealers cannot be inferred from Shoff's use of funds under the exclusive control and easily traceable to his account. See also *United States v. Howard,* 1999 US Dist. LEXIS 11197 (E.D. Pa. July 15, 1999)(several courts have held that the purchase of an automobile with proceeds from specific unlawful activity is not a financial transaction designed to conceal the nature of the location, or source of the money. Those cases involve defendants who used their proceeds to engage directly in ordinary commercial transactions). See also *United States v. Stephenson,* 183 F.2d 110, 1999 US App. LEXIS 14783 (2nd Cir. 1999) (finding evidence insufficient to show defendant's cash down payment of automobile was made with intent to conceal).

In the present case the issues was readily available for counsel to present on appellate review. The government proffered no proof that petitioner had "acted [with] subjective knowledge" that the money used in the transactions was derived from an unlawful source. Government witness Raymond Jones

---

[1] This statement was secured from the congressional intent when creating the actual bill.

testified that he did not discuss his drug business with petitioner and that he never told petitioner that he was dealing with drugs. (TR. 855 at 16-20) He further states that he cannot say for sure whether petitioner was aware that he was involved in drug trafficking while going to cars on credit. (TR. 855 at 8-15) The government informant Barron McKinney testified that Jones referred him to cars on credit to purchase vehicles. (TR. 874 at 8-10) He also states that before he purchased the vehicles from petitioner he had no dealings with him involving drugs whatsoever. (TR. 875 at 14-19) Government informant Arthur Coley also testified that he could not say yes to the fact that petitioner knew he was a drug dealer, as he never told petitioner that he was a drug dealer. (TR. 696 at 18-25; 697 at 1-3) Government informant Nathan Morales testified he brought his sister in to meet petitioner because he wanted him to think his sister was purchasing the vehicle. (TR. 721 at 10-13; 731 at 4-5; 734 at 24-25) He stated he told petitioner his sister wanted to buy the car and even mention about her employment. (TR. 735; 738 at 13-16; 739-740) Witness Morales made it clear that he did not know petitioner and never had any dealings with him. (TR. 729-730; 735 at 18-25; 736 at 1-13) Witness Morales further stated that he told drug dealer Kenneth Henderson about Cars on Credit and alleged drug dealer Norman Thomas told him of the car lot. Morales stated from his knowledge petitioner does not know the alleged drug dealer, Norman Thomas. (TR. 723 at 1-9; 724 at 3-4; 737 at 1-7) In fact, government informant

Sheppard testified that he does not know if petitioner was aware that Kenneth Henderson was a drug dealer. (TR. 431) Government informant Smith testified that he was not even sure if petitioner ever met the alleged drug dealer Steven Malette. (TR. 624 at 15-19) Smith also stated that he is not sure if petitioner had ever met the alleged drug dealer Robert Sweet and Tarik Castel. Smith states that he himself never met the alleged drug dealer "DC". (TR. 626) The government proffered no testimony from any individual identified as an alleged drug dealer in their Exhibit 28. There was just no way to way to establish petitioner's knowledge of the charged offense.

The government relies solely on witness Sheppard's and witness Smith's self serving speculative statements as to the fact that the funds used were derived from illegal sources and that the source's intent was to launder drug proceeds. Neither is there any evidence that petitioner was involved, told or was present or otherwise learned of the illegality of the alleged drug dealer's activities or that the resulting alleged illegal proceeds. So far as the record shows, the individuals involved in the money laundering transactions made no revelations to petitioner of the sources from which they derived assets for their financial transactions.

In fact, Smith's testimony clearly establishes that he was not involved in drug trafficking and did not want any drug activity around him at all. Sheppard corroborated Smith's statements. (TR. 371 at 1-9; 511 at 3-22; 512 at 1-2; 633 at 13-23; 634 at 1-4; 657 at 22-25) Sheppard also testified that

Smith told him that they could not risk the dealership having anything to do with drugs or anybody selling drugs. (TR. 371 at 1-9) These statements are not indicative of person having "intent" to launder drug proceeds or the knowledge that anyone was attempting to do so.

The fact that many customers use cash says little about whether this was drug money or innocent money. Most of the clients relied heavily on cash long before drugs became a problem for society. There was no proffered testimony that any of the alleged drug dealers were employed when the vehicle transactions took place. Additionally, the desire to misrepresent the truthful owner of an automobile provides little evidence of the fact that the money used to purchase the automobile was illicit money. See *United States v. Sanders,* 928 F.2d at 1472-73 (the court held that merely putting a vehicle under another name is not sufficient to prove an intent to conceal, more is required); *Lovett,* 964 F.2d 1029 (10th Cir.); *Antzoulatos,* 962 F.2d 720 (7th Cir. 1992)(there is certainly nothing illegal about buying a car and placing it in someone else's name); *United States v. Kaufman,* 985 F.2d 884 (7th Cir. 1992) (Kaufman agreed to title a Porche in Athens name, this itself is not illegal.)

In fact, Sheppard testified that alleged drug dealers title vehicles in their sister's, girlfriends and even their mother's names. (TR. 349 at 20-21) Further testifying that people came in to cars on credit that did not have driver licenses and he would not sell vehicles to those individuals that did not have driver's licenses. (TR. 493 at 20-25; 494 at 1-11)

23

According to the government informant witness Sheppard, "if you do not have a driver's license, then it is obvious that they were not going to be able to buy a car and drive it off the lot, so they would bring in somebody with them if they wanted the vehicle." (TR. 497 at 5-16)  In fact, witness Sheppard himself testified that he did not have a driver's license and put his own personal cars in his mother-in-law's name.  (TR. 496 at 1-4)  The record makes it abundantly clear that the titling of vehicles in other party's names was the purpose of convenience and not of concealment.

Accordingly so, this court must agree that counsel had the opportunity to present before the court that according to Supreme Court's decision in *Cuellar v. United States,* 553 U.S. 550 (2008) that at no time could petitioner have been involved in the money laundering conspiracy since petitioner had no knowledge or involvement in the actual laundering of the funds.

## E. COUNSEL WAS INEFFECTIVE FOR FAILING TO REQUEST SEQUESTRATION OF THE WITNESSES.

The Government once again takes the position that counsel could not have been ineffective by failing to sequester the witnesses that were colluding their testimony against petitioner during the trial.  Petitioner raised in his Title 28 U.S.C. § 2255 a supporting affidavit by James Blackwell who stated that he was housed in a housing cell next to where Kenneth Hunter, Baron McKinney, Marcel Brown, Richard Roberson and Ray Jones were waiting to testify and he overhead the witnesses colluding their testimony to present

to the jury to "make it seem that they were buying large quantities of cocaine from Mike McKinnon." *Id.* What remains uncontradicted in this record is that the affidavit of Mr. Blackwell cannot be discredited. Petitioner has introduced evidence before this court via the sworn affidavit of Mr. Blackwell to show that the government witnesses were in fact colluding their testimony against petitioner.

In the alternate defense, the government takes the position that there is no documentation whatsoever that petitioner advised counsel of Blackwell's claims. Once again, fact that counsel did not present an affidavit on the record establishing whether petitioner should be believed or not or whether petitioner advised counsel of Blackwell's statements remains uncontested. Counsel has failed to provide any documentation to support the position that counsel was never advised of Blackwell's testimony. In fact, the government takes the position that if petitioner was aware of the alleged collusion among prosecution witnesses as presented in the 2255 as Blackwell claims, and he failed to advise his attorney, he cannot blame trial counsel for not bringing the matter to the attention of the court. It appears that the government was not prepared to present their response.

Not only was the matter brought to counsel's attention, who in fact failed to present the same to the court at the time it was occurring, he actually presented the matter too late in his post trial motion where he addressed the issue involving Blackwell's testimony. Also, appellate counsel was ineffective

25

for failing to raise the issue on appeal regarding Blackwell's enlightment to counsel regarding the collusion of the testimony. The matter was preserved in petitioner's post trial motion before this court. Counsel raised the matter, although late, that the government witnesses were colluding their testimony in the holding cell. In the post trial motion, counsel states: "defendant McKinnon informed his counsel that Mr. Blackwell had been in the holding cell on the 10th floor of the federal building and overheard certain prosecution witnesses in this case discussing and coordinating their testimony." *Id.* This red flag should have been sufficient to place appellate counsel on notice of the collusion issue and should have raised the denial of the post trial motion on appeal. In fact, if this court determines that appellate counsel was not *per se* ineffective for his actions, then this court must agree that trial counsel was ineffective for failing to timely raise the issue or request a mistrial the minute he knew the collusion was occurring.

The government's position that petitioner cannot now raise an issue of ineffective assistance of counsel for his failure to advise counsel of the issue carries no merit as counsel was aware of the complaint. Therefore, there should be no cause and prejudice standard of review on this issue since the issue was clearly preserved for appellate review in the post trial motion that counsel prepared and appellate counsel failed to raise the same on appeal. The matter before the Court is not whether failure to raise the error was

based on a procedural bypass of direct review, but on trial and appellate counsel's ineffectiveness.

Furthermore, since the record does not contain any explanation as to counsels errors, this court must determine that counsel's actions and inactions have in fact reached a level of ineffectiveness, irrespective whether sequestration is the rule rather than the exception in the Middle District of Pennsylvania. The sworn affidavit presented by Mr. Blackwell, clearly supports that the sequestration rule was not enforced during petitioner's trial.

Also, the government's position that Marcel Brown was never a witness in petitioner's trial is bellied by the record before this court. As docket entry number 295 from May 7, 2004 clearly states, the government issued a Writ of Habeas Corpus Testificandum for Marcel Brown as a witness against petitioner Michael McKinnon. [D. E. 295] Since the record before this court conclusively shows that Blackwell's affidavit is credible and evidence contrary to the government's statements Marcel Brown was present during petitioner's trial and was colluding with the witnesses that testified during the trial, this court must agree the testimony of the all the witness should have been stricken from the record had counsel timely addressed the matter.

**F. APPELLATE COUNSEL WAS INEFFECTIVE FOR NOT CHALLENGING THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT DEFENDANT'S CONVICTION FOR DISTRIBUTION OF CRACK COCAINE.**

Notwithstanding the government's position that appellate counsel could not have rendered ineffective assistance for failing to challenge sufficiency of the evidence for distribution of crack cocaine on appeal, petitioner presents that in light of the statements presented herein establishing that the government witnesses had in fact colluded between themselves in the preparation and presentation of petitioner's trial, that appellate counsel had an obligation to present not only the sufficiency of the evidence in total, but the sufficiency of the evidence to support the conviction for the distribution of crack cocaine. Since it has been established that the government witnesses colluded to support the drug transactions as to petitioner's involvement, the matter of the sufficiency of the evidence was an issue to raise on appeal.

Irrespective of the fact that each witness testified as to a different drug transactions, there is no doubt, as the record reflects before this court that the government witnesses colluded in order to convict petitioner at all costs. There is no way to determine the extent of collusion that was committed. Once the well is poisoned, all the water is contaminated. There is no way to undue what has already been contaminated.

The fact that had counsel presented that the government witness had in fact colluded, would have supported the argument that the witnesses were not credible and the testimony could not have supported a conviction for

28

distribution of crack cocaine.   Accordingly, this court must agree that the granting of an evidentiary hearing is required to determine the extent of prejudice that petitioner is suffering because of appellate counsel's ineffectiveness in his failure to raise such a credible issue on appeal.

## G. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO AN OBSTRUCTION OF JUSTICE ENHANCEMENT THAT DID NOT APPLY TO PETITIONER'S CASE

Section 3C1.1 of the sentencing guidelines provides a two level enchantment if the defendant willfully obstructed or impeded to attempt to obstruct or impede the administration of justice during the course of the sentencing in the instant offense.   The application explains that the adjustment applies to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant witness, or juror, directly or indirectly, or attempting to do so."   The government bears the burden of proof when it seeks an upward adjustment.   See *United States v. Belletiere*, 971 F.2d 961 (3rd Cir. 1992).   All the requirements needed for counsel to object to the same were preserved for counsel.

In petitioner's case, there were no threats to support a § 3C1.1 enhancement.   Informant McKinney testified there were no threats made towards him.   (TR. 888 at 14-16)   In order for the application to apply, a defendant must either threaten the witness in his presence or issue a threat in circumstances in which there is some likelihood that the witness learns of the threat.

Obviously, the government must allege that petitioner either intimidated, influenced or both the witness for the sections 3C1.1 enhancement to apply. What is also obvious on the government's response brief is that they are alleging that petitioner did not intimidate or influence McKinney directly but through an alleged cellmate.[2]

The government alleges that petitioner instructed his cellmate to both deliver and retrieve the alleged affidavit. What is missing is any evidentiary support to back up the government's claims. There is no testimony from any alleged cellmates that petitioner instructed them to do anything. There is no testimony from any government witnesses that they viewed or heard petitioner instruct the alleged cellmate to deliver this alleged affidavit or retrieve it from McKinney.

Informant Grayson testified that petitioner told him he was going to have McKinney sign something saying he was not going to testify or cooperate. (TR. 294)  There are however, no statements from Grayson alleging that petitioner was going to instruct this alleged cellmate to do anything whatsoever.   Most importantly, Grayson states that petitioner never described the paper, did not name the paper, and he had never seen the paper. (TR. 294-295)  What the government now claims is that this alleged paper that Grayson has never seen, has never been named, or described, was actually the alleged affidavit that petitioner's alleged cellmate delivered and

---

[2] This cellmate has yet to be located and this court refused to allow petitioner an opportunity to secure the government's notes of the cellmate.

retrieved. McKinney has made no statements pertaining to witnessing petitioner's alleged cellmate being _instructed_ to deliver any affidavit. He also does not state that the alleged cellmate relayed this theory to him. (TR. 887-888)

The § 3C1.1 enhancement can only apply to defendants who willfully obstructed or impeded or willfully attempted to obstruct or impede the administration of justice. McKinney's testimony was that the alleged affidavit was not given to him by petitioner; it was given to him by someone else. This alleged cellmate asked him to rewrite it and sign it or something of that nature. It was signed and given back to the alleged cellmate. (TR 887-888) However, what is missing is the nexus to petitioner and the document.

Utilizing the government's own words in their response, "one would certainly expect a defendant as contumacious as defendant to utilize every means at his disposal in fighting his case while at trial." Surely, petitioner would have used a signed affidavit from informant McKinney to aid in his cross-examination. His testimony is already suspect with the facts that he states Raymond Jones, who was his supplier, instructed him to call petitioner for crack after stating that he did not have any. (TR. 864) (See Jones Affidavit attached and Trial Testimony at 848-857)

The government repeatedly throughout their response brief mentions this alleged affidavit. If the affidavit was signed, surely it must have gotten notarized. The government with their vast resources and manpower could

have easily obtained the document from the Dauphin County Prison that would have reflected the alleged affidavit as ever being prepared.

Finally, the failure of trial counsel to object to the obstruction of justice enhancement in light of the missing documentation and missing affidavit, is an issue that once again based on the lack of affidavit from counsel as to the reasoning why the obstruction was not presented, this court must assume that counsel in fact rendered ineffective assistance on the matter. Without granting an evidentiary hearing to determine counsel's reasoning for his actions or inactions, the court cannot make a final determination on the merits.

**H.   COUNSEL AND APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO CONTEST THE PRESENTENCE INVESTIGATION REPORT OFFICE ENHANCEMENT FOR RECKLESS ENDANGERMENT WHILE FLEEING LAW ENFORCEMENT AT THE TIME THAT THE ALLEGED OFFICERS WERE FOLLOWING PETITIONER**

For a § 3C1.2 enhancement to be applicable, petitioner must be aware that he is purposely fleeing from a law enforcement officer. In support of this argument, petitioner relies on *United States v. Sykes,* 4 F.3d 697 (8th Cir. 1993), and *United States v. Cabral-Castillo*, 35 F.3d 182 (5th Cir. 1994). Both the courts in *Sykes* and *Cabral* without stating the obvious implied that the defendant must know that the person pursuing him is a law enforcement officer in order for a § 3C1.2 enhancement to apply. This requirement is also mandated by application note 3 of § 3C1.2, which states: "during flight it is to be construed broadly that includes preparation for flight. Therefore, this

argument is also applicable where conduct occurs in course of resisting arrest." Thus, the origin of § 3C1.2 suggests that it requires that the defendant be aware that he is fleeing from law enforcement officers versus fleeing from a person pursuing him for different reasons.  See also *United States v. Martin,* 264 Fed. Appx. 857 (11th Cir. 2008) (knowledge of law enforcement is required); *United States v. Hayes,* 135 F.3d 435 (6th Cir. 1997) (in order for these enhancements to apply defendant must have reason to know that he is *fleeing from a law enforcement officer*); *United States v. Littles,* 2000 US App. LEXIS 12476 (2th Cir. 2000) (Littles may be correct that this enhancement only applies if the defendant *knowingly flees a law enforcement officer*).

In fact, the affidavit Jamal Barker attached to this pleading establishes that at no stage did Petitioner not know at the time that he was being chased by Law Enforcement. (Appendix E)  In fact, the affidavit addresses that Petitioner apologized to the Agent for his actions since he was unaware that they were law enforcement officers.

The government in their response brief alleged that petitioner was aware that he was being pursued by law enforcement because he threw a bag containing marijuana out of the window of his van and that he called his girlfriend to report being chased by the police after discarding the marijuana. The issue regarding the marijuana has already been addressed in this brief and there is a reasonable probability that it was another vehicle, not

33

petitioner's vehicle, that threw the marijuana out of the vehicle in the area of the construction site. Also, what is missing from the evidence to back up the government's position is that petitioner has been unable to locate any testimony that *anyone witnessed him throw the bag of marijuana from the vehicle*. Ironically, every witness that testified on the government's behalf *never stated that they saw where the marijuana bag came from*. Additionally, petitioner asserts that § 3C1.1 enhancement requires that he be aware that he was fleeing from a law enforcement officer at the outset of the attempted arrest. In the government's response brief, they present no evidence of the initiation of the arrest attempt so that petitioner was aware that he was being pursued by law enforcement and not by any other individual that who would possibly rob petitioner knowing that he was involved in the industry of selling vehicles and may have money with him or to kidnap petitioner for ransom thinking he had money. The knowledge of pursuit by law enforcement is the staple required in order to support the § 3C1.1 sentence enhancement. Supporting the government's position in *United States v. Sawyer,* 115 F.3d 857 (11th Cir. 1997), the *Sawyer* court determined that an individual giving chase must in fact be a law enforcement officer as opposed to a citizen attempting to affect a citizen's arrest. The problem with this position is that the petitioner at no time knew that these individuals chasing him in the vehicle were in fact law enforcement officers and not imposters. There is no evidence supporting the position that petitioner knew that these

were law enforcement officers as opposed to any other criminal defendant attempting to rob and kidnap petitioner. In fact, the DEA government witnesses testified that the windows in the vehicle were "tinted on both sides and in the back and that the incident of arrest happened very fast." (TR. 50-52) Neither did the vehicle possess any emergency equipment nor markings presenting a law enforcement markings. No agent could testify that petitioner specifically knew that the person chasing him down the road were in fact law enforcement officers.

Tawana McKinnon provided an affidavit that she heard an agent advise petitioner that he would be charged with attempted murder for almost running the agent over and heard defendant apologizing same that he did not know they were law enforcement officers. The government wishes for the Court to discredit and disregard petitioner's sister's affidavit, when they have failed to secure an affidavit from counsel on the matter. The mere fact that petitioner's sister provided a sworn affidavit before this court, is sufficient for the court to determine an evidentiary hearing must be held to determine which party is telling truth. This Court cannot say that the statements are "inherently incredible." *United States v. Crooker*, 729 F.2d 889, 890 (1st Cir. 1984). Nor are they mere "conclusory allegations unsupported by specifics." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977). And, nothing in the record before this Court "conclusively contradicts" what Petitioner and the additional affidavits say. *United States v.*

*Butt,* 731 F.2d 75 (1st Cir. 1984).Rather, "[t]he factual allegations ··· relate ··· primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light." *Machibroda v. United States,* 368 U.S. 487, 494-95, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962); *see Baumann v. United States,* 692 F.2d 565, 581 (9th Cir. 1982); *United States v. Unger,* 665 F.2d 251, 254 (8th Cir.1981); *United States v. Marzgliano,* 588 F.2d 395, 399 (3rd Cir. 1978)

Once the court reviews Ms. McKinnon's testimony in its entirety, then the court can make a factual determination as to whether her statements should be believed or not. However, that cannot be done until an evidentiary hearing has been granted on the matter. See, *Virgin Islands v. Weatherwax,* 20 F.3d 572, 573 (3rd Cir. 1994)(Petitioner entitled to evidentiary hearing on ineffective assistance of counsel claim where facts viewed in ***light most favorable to Petitioner*** would entitle her to relief); *Stoia v. United States,* 22 F.3d 766, 768 (7th Cir. 1994) (same); *Shaw v. United States,* 24 F.3d 1040, 1043 (8th Cir 1994) (same); *Nichols v. United States,* 75 F.3d 1137, 1145-46 (7th Cir. 1996)(Petitioner entitled to evidentiary hearing on claim of ineffective assistance of counsel when record inconclusive on issue); *United States v. Witherspoon,* 231 F.3d 923 (7th Cir. 2000).

In fact, what is even more puzzling is that petitioner turned himself in only minutes after the alleged incident took place. After receiving a call from his sister explaining that the authorities were looking for him and that they

were at his residence, petitioner relayed to her that he was on his way to turn himself in.   When he arrived at his sister's residence and surrendered, petitioner apologized to law enforcement officers for not knowing that they were the actual individuals that were pursuing him.

Based on these statements, this court cannot reach a conclusion that petitioner *willfully* fled from law enforcement officers while knowing that the individuals chasing him down the construction area were in fact law enforcement officers.

Accordingly, this court must agree that counsel's failure to properly object and present for appellate review whether the reckless endangerment enhancement could apply in this case has caused counsel's performance to fall below an objective standard of reasonableness.  The fact is that petitioner not knowing that he was being chased by law enforcement did what any other individual fleeing for their life would do; flee from the area as soon as possible.   And upon realizing that the persons following petitioner were actually law enforcement officers, petitioner immediately turned himself in and apologized to the same.

Accordingly, this court must agree that counsel's failure to properly present and contest the issue of the reckless enhancement, as rendered counsel's performance to fall below an objectable level of reasonableness.

## CONCLUSION

WHEREFORE, based on all the facts of this case and on the lack of documentation before this court, Petitioner respectfully prays this Honorable Court will grant an evidentiary to address what strategies if any, can be attributed to counsel's failure to prepare.

Done this ___22___, day of February 2011

Respectfully submitted,

_____
Michael McKinnon
Reg. # 27735-083
MCFP Springfield
Medical Center/Federal Prisoners
P.O. Box 4000
Springfield, MO  65801

## CERTIFICATE OF SERVICE

I HEREBY DO CERTIFY that a true and correct copy of this pleading was mailed to: Christy Fawcet, 228 Walnut Street, 2nd Floor, P.O. Box 11754, Harrisburg, PA 17108 with sufficient First Class Postage.

Done this ___22___, day of February 2011

Respectfully submitted,

_____
Michael McKinnon
Reg. # 27735-083
MCFP Springfield
Medical Center/Federal Prisoners
P.O. Box 4000
Springfield, MO  65801

Page Number 2

## CLOSED INCIDENT REPORT

Incident #:  L8B

Agency Name:  W.S. REGIONAL

Receive Source:  T

Municipality:

Current Location:  10TH* ST/LOWTHER ST
Original Location:  10TH* ST/LOWTHER ST

Case #:          MI #: 030116901

Date/Time Rcvd:  09/25/03 09:25:19

Oper ID: JTMCCO

Alarm:          Disp Code: CLR

Comm/Alias:

| Grid | Zone | Area | Dist | Apt. | | Priority | Prev. Pri. |
|------|------|------|------|------|--|----------|-----------|
| 9999 | 999  | 99   | 99   |      | | 2        |           |

| Routed | Dispatched | Enroute | Arrived | Cleared |
|--------|-----------|---------|---------|---------|
| 09/25 09:28:07 | 09/25 09:28:28 | | | 09/25 09:43:22 |

Current CFS                          Orig    Upd. 1  Upd. 2  Upd. 3  Upd. 4
PRKDA  PRECKLESS DRVR ACT            PRKDA

---

### CALLER/SUBJECT

Name: STEVE WARREN  (WITNESS)        Phone: H(717)   -    W(717)379-3489
C/S:  C       Addr: W/ DB KRIEG CONSTRUCTION
Act: CAL      City:                  ST: PA     Zip:     -

Sex:    Race:   DOB:                 Driver's License:
State:  Year:
Name: JACK BOYER                     Phone: H(717)   -    W(717)567-3373

C/S:  8       Addr: W/ HEMPT BROS
Act: SUP      City:                  ST: PA     Zip:     -
Sex:    Race:   DOB:                 Driver's License:

State:  Year:
Name: MICHELLE RAISBECK              Phone: H(717)737-9807 W(717)   -
C/S:  9       Addr: 261 E CRESTWOOD DR
Act: SUP      City: CAMP HILL        ST: PA     Zip:     -
Sex:    Race:   DOB:                 Driver's License:
State:  Year:

---

### COMMENTS

| Date | Time | Oper. | CC | Comment |
|------|------|-------|----|---------|
| 09/25/03 | 09:25 | JTMCCO | CT | C/A) DARK TAN CHRYSLER MINI-VAN W/ DEALER TAGS |
| 09/25/03 | 09:25 | JTMCCO | CT | BLACK MALE DRIVER -- RAN RED LIGHT -- ERRATIC DRIVER |
| 09/25/03 | 09:28 | JTMCCO | CO | AREA OF CONSTRUCTION BY INTERSTATE 83 |
| 09/25/03 | 09:28 | DMKANE | DP | Res: 3204AED Disp |
| 09/25/03 | 09:28 | JTMCCO | CO | LAST SEEN HEADING TOWARDS CARLISLE ROAD |
| 09/25/03 | 09:28 | JTMCCO | CO | CALLER ADVISED HE ALMOST HIT SEVERAL VEHICLES WHILE RUNNING |
| 09/25/03 | 09:29 | JTMCCO | CO | THE RED LIGHT |
| 09/25/03 | 09:30 | RMGRIF | CT | 2 DARK GRAY VANS CHASING EACH OTHER |
| 09/25/03 | 09:30 | RMGRIF | CT | POSS SOME KIND OF ROAD RAGE  LS ON I83 NB |
| 09/25/03 | 09:30 | JTMCCO | CT | M/C) ANOTHER ERRATIC DRIVER JUST CAME THRU DRIVING |
| 09/25/03 | 09:30 | JTMCCO | CT | A SMALL VEHICLE -- JUST THRU A BAG OUT OF THERE VEH |
| 09/25/03 | 09:31 | JTMCCO | CO | POSS. ACT 64 INSIDE THE BAG |
| 09/25/03 | 09:32 | JTMCCO | CO | WOULD LIKE A OFFICER TO COME TAKE A LOOK |

-/\-

Page Number      2

Incident #     L85
DETAIL (continued)

Date    Time   Oper.  CC Comment
------  ----   ----   -- -------------------------------------------------------------
09/25/03 09:34 JDQUIR CO IND NAME IS MICHAEL MCKINNON IS OPR   PA-J12937J
09/25/03 09:34 JDQUIR CO BODY DAMAGE TO PASSENGER SIDE
09/25/03 09:35 JDQUIR CO HE HAS FEDERAL ARREST WARRANTS AND LOCAL CHARGES
09/25/03 09:36 JDQUIR CO HE IS RUNNING FROM FEDERAL AGENTS
09/25/03 09:36 JDQUIR CO THE FOLLOWING INFO CAME FROM DCR
09/25/03 09:39 DMKANE CO PER 3204 GAVE INFO TO PSP HARRISBURG SINCE THEY WERE ON 83
09/25/03 09:39 DMKANE CO NOW
09/25/03 09:43 DMKANE LI 03268L85 linked to 03268L86
09/25/03 09:43 DMKANE LI 03268L85 linked to 03268L87
09/25/03 09:43 DMKANE CL Finish/Clear Resource Number: 3204AED

NARRATIVE

Narrative entered by PID JDQUIR on 09/25/03 at 09:41:04
CUM217-73884 - MVR      09/25/03 09:38:39 - 09/25/03 09:38:39 8CKGVALB88MW
         RESPONSE FROM PENNSYLVANIA BUREAU OF MOTOR VEHICLES

     OWNER INFORMATION
------------------------------------------------------------------------------
NEW HERITAGE AUTO SALES
319 HIGH STREET
WATERFORD     , PA. 16441
COUNTY = ERIE

              VEHICLE INFORMATION
------------------------------------------------------------------------------
LIC: J12937J.        EXPIRES: 04-04.
VMA:                 . VYR:      . VST:      .  VIN:
TLN: 08618975.       REG GR WT:

              RESOURCE HISTORY

Resource   Date     Time     SC Pid1  Pid2   Pid3   Pid4   Pid5   Pid6   Pid7
---------  ----     ----     -- ----  ----   ----   ----   ----   ----   ----

3204AED    09/25/03 09:28:28 DP
                                                     Pid8:

    D      09/25/03 09:43:22 AV
                                                     Pid8:

              VEHICLE INFORMATION
------------------------------------------------------------------------------
Type:    Plate: J12937J  State: PA Tag Year: 2003 Color:     Veh Year:
Make:      Model:    VIN:
Towed to:
Reason:
Comments:
------------------------------------------------------------------------------
Type:    Plate: YHF1438  State: PA Tag Year: 2003 Color:     Veh Year:
Make:      Model:    VIN:
Towed to:
Reason:
Comments:
------------------------------------------------------------------------------

11/08/2005  16:06    18142383204                    STMORITZSECURITY                    PAGE  04/04

From:DEPT OF PUBLIC SAFETY        717 245 8710        09/08/2004 13:35 #177 P.006/008

Page Number    3

cident #    L87              VEHICLE (continued)

omments:
----------------------------------------------------------------------------------
ype:   Plate: J12937J  State: PA Tag Year: 2003 Color:        Veh Year:
ake:       Model:      VIN:
owed to:
eason:
omments:
----------------------------------------------------------------------------------

1    A.   I was in the car with Shawn Shepherd.   Agent Juba

2  was driving.   And I was directing him where to go as I

3  was directing Mr. Shepherd to make phone calls.

4    Q.   Okay.  So the three of you were in the vehicle?

5    A.   Yes.

6    Q.   I have no further questions.

7    A.   Actually, there was another agent in the vehicle.

8    Q.   And that was?

9    A.   I don't know her name.   It's a female agent with

10  the State Bureau of Narcotics.   And she rode along as

11  essentially manpower.

12           THE COURT:  Or woman power.

13           THE WITNESS:  Woman power.

14  BY MR. PINSKEY:

15    Q.   By chance, would her name be Michelle Resback?

16    A.   No.   I think her first name might be Courtney.

17           MR. PINSKEY:  I have no further questions.

18           THE COURT:  Redirect.

19                    **REDIRECT EXAMINATION**

20  BY MS. FAWCETT:

21    Q.   Do you know who Michelle Resback is?

22    A.   No.

23    Q.   Do you recall interviewing individuals who were

24  making telephone calls with respect to what had occurred

25  at the construction site just after the incident with

-B-

1  Shawn Shepherd?

2     A.  Yes, I do.

3     Q.  Was one of those individuals Michelle Resback?

4     A.  Yes.

5     Q.  Did you speak with Michelle Resback?

6     A.  I did.

7     Q.  All right.  You testified that Agent Kegerreis,

8  who is seated next to me, and you were the lead

9  investigators; Agent Kegerreis for the Department of

10  Treasury, you for the DEA.  Can you give us an idea of

11  how many other investigators were involved in the

12  execution of the search and arrest warrants on September

13  25th, 2003?

14     A.  I would estimate 120 agents and officers.

15     Q.  Okay.

16     A.  Total.

17     Q.  And you've testified to some of the locations

18  that were searched on that morning.  Were the search

19  warrants that were obtained for all those locations your

20  search warrants or were some of them your search

21  warrants and others, other individual's search warrants?

22     A.  Some were search warrants that I was the affiant

23  for, which means I swore to the affidavit's facts for

24  those particular places.  Other search warrants were

25  sworn to by Agent Kegerreis.

1    Q.   Okay.   And you told us that some of the search

2  warrants involved in this case were document warrants.

3  Can you explain to us what a document warrant is as

4  opposed to another kind of search warrant?

5    A.   A document warrant means that I am going before a

6  judge and presenting probable cause that I will find

7  documents or other evidence indicating that drug

8  trafficking has occurred.   Among those that might be

9  listed in an affidavit to search for documentary

10  evidence would be drug owe sheets, would be scales,

11  would be things that drug traffickers use as tools for

12  drug trafficking, but not necessarily drugs themselves,

13  because in an affidavit, it's laid out that drug

14  traffickers often don't store the drugs in the same

15  place that they might have documentary evidence such as

16  their drug owe sheets or their money, their jewelry,

17  things of that nature, which they tend to have.

18    Q.   Do you know whether in this case for the

19  residences of Karen Lindsay and Michelle Smith, Chad

20  Smith's sisters, are the warrants issued in that case,

21  for those particular residences, were documents warrants

22  or drug warrants?

23    A.   They were document warrants.

24    Q.   You testified in cross examination that there was

25  no significant amount of controlled substances found at

1   the Hummel Avenue apartment.  Are you aware of whether

2   or not there were controlled substances, whether they're

3   deemed significant or insignificant, found at the Hummel

4   Avenue apartments?

5          MR. PINSKEY:  Excuse me.  If the witness can

6   testify from firsthand knowledge.  Otherwise, I would

7   object.

8          MS. FAWCETT:  Well, the question in cross

9   was concerning whether or not there were drugs found at

10  that address.  He was asked that question on cross, and

11  I think I am entitled to have him explain it on

12  redirect.

13         THE COURT:  Overrule the objection.

14         THE WITNESS:  There were controlled

15  substances, as determined by a DEA lab, found at 308

16  Hummel Avenue.

17  BY MS. FAWCETT:

18    Q.  And were there drugs turned over to investigators

19  in this case as a result of what occurred on September

20  25th, 2003?

21    A.  Yes.

22    Q.  Do you know generally the individuals who turned

23  those over to investigators?  Were they civilians?

24    A.  They were.

25    Q.  You testified that you did not take the

1   photograph of Government's Exhibit No -- the photograph

2   that is Government's Exhibit No. 87, the picture of the

3   van.  Can you tell us whether or not the van that's

4   shown in that Government's exhibit or whether that

5   photograph shows the van as it appeared on the morning

6   of September 25th, 2003?

7       A.  Yes.  It is -- can I take a closer look at it?

8       Q.  Sure.

9       A.  It is after the incident because there's damage

10   to the van, which I know occurred on September 25th.

11      Q.  All right.

12          MS. FAWCETT:  I have no further questions.

13          THE COURT:  Recross.

14                    **RECROSS EXAMINATION**

15   BY MR. PINSKEY:

16      Q.  Agent Cunney, when you issued -- when you go out

17   executing on a document warrant, and if you come across

18   drugs in plain view in the area that you were searching

19   for the documents, do you ignore the drugs?

20      A.  No, I seize them.

21      Q.  So am I to understand then that, in executing

22   these document warrants, you didn't notice any drugs in

23   plain view at the sisters' house, Michelle and --

24   Michelle Smith and Karen Lindsay?

25      A.  We did not notice any drugs.

1    Q.   Okay.

2    A.   Well, I didn't search those locations, but the

3   agents that searched them did not find any.

4    Q.   Maybe I should clarify this, and this would be

5   helpful.  What warrants did you personally execute on?

6    A.   I actually started out the operation on September

7   25th at a warrant that Agent Kegerreis had been the

8   affiant for.  As the lead investigator, you have to --

9   there's numerous search warrants occurring at the same

10   time or simultaneously, and I deemed that location

11   initially to be the most important location.

12    Q.   Which one?

13    A.   The 1409 Montfort.

14    Q.   That's Shawn Shepherd's residence?

15    A.   Yes, and that was also executed, I believe,

16   slightly before the others.

17    Q.   And you executed that personally?

18    A.   I was present there.

19    Q.   Okay.  And that was --

20    A.   And then I left.

21    Q.   That was an arrest warrant or a search warrant or

22   both?

23    A.   That was an arrest warrant and a search warrant.

24   And the arrest warrant was for Shawn Shepherd.  The

25   search warrant was for 1409 Montfort.

## ADDITIONAL SUPPORTING DOCUMENTS

1.      **Governments List of Exhibits:** The government listed the Id's and documents surrendered by Vernon Grandon, 308 Hummel Ave. landlord, as exhibit #7. These are the very same items that were planted by Agent Andrasi, and admitted at my trial.

2.      **911 Call Center Report:** Mr. Steve Warren and Jack Boyer who called 911 during the incident that occurred during the day of my arrest on September 25, 2003. Both gentlemen testified at my trial and stated in their testimony that they did not see me throw anything from my vehicle. (please refer to their trial testimony). No D.E.A. Agents or law enforcement in any form testified that they witnessed me with throw a bag from vehicle or with drugs in any form. A Michelle Raisbeck called the 911 Call Center at 9:30 Am on the 25th of September 2003 and reported 2 vans chasing each other and another erratic driver just came through driving a small vehicle-- just threw a bag out of there vehicle. (See 911 Call Report enclosed). DEA Agent Andrew Cunney testified under oath that he spoke with Ms. Raisbeck but, he failed to turn over her statements to the defense and failed to correct the lie being perpetrated at my trial that the bag of marijuana belonged to myself.(See trial trans. p.p. 31 at 21-25; 32 at 1-7). It is well documented both in trial records and in investigative reports that I was driving a van and the DEA that was pursuing me was also in a van.(See transcript exhibit). Neither the DEA or myself was operating a small vehicle. Ms. Raisbeck stated as the call report denotes that 2 vans were chasing each other and then another erratic driver in a small vehicle threw a bag out of there vehicle. Ms. Raisbeck obviously was the only witness who could identify where this bag came from, yet she was not called to testify by the government. The government instead chose to call the other two individuals who could not identify were this bag came from that called the 911 call center also. Agent Cunney was aware during his trial testimony that the bag of marijuana was not thrown from my vehicle and yet he stood silent while this injustice took place.

3.      **Government Witness List:** Denotes Agent Andrasi, Agent Cunney, Stephen Warren, and Jack Boyer testifying for the government. No Michelle Raisbeck.

4.      **Investigative Reports:** Denoting vans that myself and DEA agents were driving.Also denoting that Agent Andrasi was the individual who seized the marijuana residue allegedly found in the Hummel Ave. property, and the blue Empress suitcase was obtained by Agent Andrasi.

If there is any further assistance I can give please feel free to contact me.

Respectfully Submitted,
Michael McKinnon

Dated: August 15, 2007

—C—

## AFFIDAVIT / DECLARATION OF RAYMOND JONES

I, Raymond Jones, AKA "Ray", AKA "Dog", do hereby certify that I am competent to state the matters included in this affidavit / declaration, have knowledge of the facts contained herein and declare that to the best of my knowledge that the statements opinionated in this affidavit / declaration are true, correct, certain, complete, and not meant to mislead and hereby make these statements of facts in accordance with the laws of the United States under penalty of perjury pursuant to [ Title 28 U.S.C. 1754 (1) ].

1. I am Raymond Jones, number 11681-067. I am currently incarcerated at U.S.P. Lewisburg Camp.

2. I have never seen Michael Mckinnon with crack cocaine or powder cocaine since his release from prison in May of 2001. I have only seen him with small amounts of marijuana of which to my understanding was of his personal use.

3. I was a personal friend of Michael Mckinnon and seen him on a regular basis.

4. I have never instructed, suggested or mentioned to anyone including Baron Mckinney AKA "Lil B", to contact in any fashion, Michael Mckinnon for the purpose of buying, selling or storing narcotics in any form.

5. I have never witnessed or have been in the company of Michael Mckinnon while he met with Richard Roberson (AKA "Rick Ro") in any way shape or form. I have never witnessed Michael Mckinnon buy or sell narcotics of any kind to Richard Roberson (AKA "Rick Ro").

6. I have never had any type of conversation with Michael Mckinnon concerning any aspect of laundering money. I have never heard or witnessed, any type of conversation with Michael Mckinnon suggesting laundering money.

7. I purchased vehicles from cars on credit for my own personal enjoyment and benefit.

8. There was no attempt on my part to launder any money. I purchased vehicles for my personal benefit only.

9. I personally witnessed Michael Mckinnon by exotic marijuana (purple haze) from "Nick" that was delivered in a small bag.

10. I alone instructed Larry Whitaker to break into Don's Towing in an attempt to retrieve money that was left in a vehicle I was driving. Michael Mckinnon had nothing to do with that situation.

11. If questioned properly at Michael Mckinnon's trial I would have testified to the aforementioned facts.

12. I would testify in any court forum in support of the statements (1-12) included in this

-D-

affidavit / declaration and welcome the opportunity to do so.

I, Raymond Jones , do hereby certify that the statements contained in this affidavit/declaration, were voluntarily submitted, without coercion, and are true, correct, complete, certain, and not meant to mislead, submitted in accord with the laws of the United States under penalty of perjury pursuant to [ Title 28 U.S.C. 1746 (1)

Raymond Jones

Subscribed and sworn to before me, a Notary Public, on this _____ day of _____ 200_, who's identity is well known or proved to me, signed and sealed the foregoing affidavit, and acknowledged the same to be his free act and deed.

Notary Public _____  My Commission Expires ____6/27/2010____

STATE OF CALIFORNIA          )    AFFIDAVIT OF
                                )
COUNTY OF SAN BERNADINO    )    KENNETH HENDERSON
                                )

I, Kenneth Henderson, AKA "Locke", do hereby certify that I am competent to state the matters included in this affidavit, have knowledge of the facts contained herein and declare that to the best of my knowledge that the statements declared in this affidavit are True, Correct, Certain, Complete, and not meant to mislead and hereby make these statements of facts in accordance with the laws of the United States under penalty of perjury pursuant to [Title 28 U.S.C. 1746].

1.    I am Kenneth Henderson, register number 11978-067 currently incarcerated in the Bureau of Prisons.

2.    I have never purchased narcotics from Michael McKinnon. I have never sold narcotics to Michael McKinnon.

3.    I have never witnessed Michael McKinnon with narcotics in any form.

4.    I have never purchased a vehicle from Michael McKinnon. I have never had a conversation pertaining to purchasing vehicles with Michael McKinnon.

5.    I purchased vehicles for my own personal benefit and not to launder any money.

6.    I was not brought to Harrisburg by Michael McKinnon from New York City.

7.    I was not a mutual friend or aquaintance of Michael McKinnon, while in Harrisburg, PA, or New York City.

8.    I was not directed to Cars on Credit by Michael McKinnon. I did not personally know Michael McKinnon while in Harrisburg, Pennsylvania or anywhere else. To the best of my knowledge, Michael McKinnon did not know any of my associates.

9.    To the best of my knowledge Michael McKinnon did not know Norman Thomas (AKA "Boo").

-1-

10. To the best of my knowledge, Michael McKinnon has never had any involvement with narcotics with Norman Thomas (AKA "Boo").

11. To the best of my knowledge, Michael McKinnon did not refer Norman Thomas (AKA "Boo") to Cars on Credit.

12. To the best of my knowledge, Michael McKinnon has never sold Norman Thomas a vehicle.

13. If I had been interviewed by Michael McKinnon's trial attorney, I would have attested to the foregoing facts.

I, Kenneth henderson, do hereby certify that the statements contained in this affidavit, were voluntarily submitted, without coercion, and are True, Correct, Complete, Certain, and not meant to mislead, submitted in accord with the laws of the United States under penalty of perjury pursuant to [Title 28 U.S.C. 1746].

_Kenneth Henderson_
Kenneth Henderson

Subscribed and sworn to before me, a Notary Public, on this _6_ day of _February_, 2008, who's identity is well known or proved to me, signed and sealed the foregoing affidavit, and acknowledged the same to be his free act and deed.

Notary Public_____ **AUTHORIZED BY THE ACT OF JULY 7, 1955, TO ADMINISTER OATHS (18 USC 4004)**

My Commission Expires_____

*Cmclah. Unit Mgr*
*Federal Bureau of Prison*
*USP Victorville, CA.*

## DECLARATION OF JAMAL BARKER

I, Jamal Barker, do hereby certify that I am competent
to state the matters included in this declaration, have
knowledge that the statements opinionated in this declaration
are true, correct, complete, and not meant to mislead and
hereby make these statements of facts in accordance with
the laws of the United States under penalty of perjury pursuant
to [Title 28 U.S.C. 1754(1)].

1.  I am Jamal Barker. I currently reside at 220 South
    20th Street, Harrisburg, PA.

2.  I was present in the residence located at 220 S. 20th
    St. Hbg. PA., on September 25, 2003 when Michael McKinnon
    turned himself in and was taken into custody by the
    Hbg. D.E.A. I was located in the kitchen at the time.

3.  I personally witnessed a conversation with Michael
    McKinnon and a D.E.A. Agent that entailed Michael McKinnon
    tell the agent that he did not know who they were when
    they initially came to arrest him, and then apologized
    for the incident.

4.  I specifically heard Michael McKinnon apologize to
    the agent for the incident that happened on the morning
    of September 25, 2003, and explain to the agent that
    he did not know they were police.

5.  I would testify in any court forum in support of these
    statements (1-4) included in this declaration and welcome
    the opportunity.

I, Jamal Barker, do hereby certify that the statements
contained in this declaration, were voluntarily submitted,
without coercion, and are true, correct, complete, certain,
and not meant to mislead, submitted in accordance with the
laws of the United States under penalty of perjury pursuant
to [Title 28 U.S.C. 1746(1)].

*Jamal Barker*
Jamal Barker

May 30, 2008

_E_

## DECLARATION OF TAWANA L. MCKINNON

I, Tawana L. McKinnon, do hereby certify that I am competent to state the matters included in this declaration, have knowledge of the facts contained herein and declare that to the best of my knowledge that the statements made in this declaration are true, correct, certain, complete, and not meant to mislead and hereby make these statements of facts in accordance with the laws of the United States under penalty of perjury pursuant to [Title 28 U.S.C. 1754(1)].

1. I am Tawana L. McKinnon. I currently reside at 220 South 20th Street, Harrisburg, PA. My brother is Michael McKinnon.

2. On the morning of September 25, 2003, I was making breakfast before going to work, it was about 9AM. I heard a knock at my front door and looked out to see police officers with a black pole ready to ram my door.

3. I opened the door and allowed them to enter my residence. They then produced a warrant for my brother, Michael McKinnon, and proceeded to search my residence. I was put in the kitchen with my fiance Jamal Barker with whom I share the home with.

4. I was asked to contact my brother, at which time I did via telephone, and explained to him the situation that the D.E.A. was here in my home with a warrant for his arrest. My brother stated to me at that point that he was on his way to my house to turn himself in.

5. When my brother arrived he came in through the front door and met with the agents in the living room area. At that point an agent stated to my brother that he was going to charge him with attempted murder due to him almost hitting the agent with his van.

6. I clearly and unequivocally heard along with my fiance Jamal Barker, my brother respond to the agent that he did not know who they were, and that they never identified themselves, and apologized for the incident.

7. I along with my fiance was never questioned concerning whether my brother stated that he did not know they were police officers.

8. I would testify in any court forum in support of the statements (1-7) included in this declaration and welcome the opportunity.

I, Tawana L. McKinnon, do hereby certify that the statements contained in this declaration, were voluntarily submitted, without coercion, and are true, correct, complete, certain, and not meant to mislead, submitted in accordance with the laws of the United States under penalty of perjury pursuant to [Title 28 U.S.C. 1746(1)].


*Tawana L. McKinnon*
Tawana L. McKinnon


May 30, 2008

AO 93 (Rev. 5/85) Search Warrant

# United States District Court

_____ MIDDLE _____ DISTRICT OF _____ PENNSYLVANIA _____

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE **RESIDENCE OF JENNIFER ROBINSON,** 308 HUMMEL AVENUE, 1ST FLOOR APARTMENT, LEMOYNE, PA 17043 | **SEARCH WARRANT** CASE NUMBER: 1:CR-03-251 [UNDER SEAL] |

To: **DEA SPECIAL AGENT ANDREW B. CUNNEY**  and any Authorized Officer of the United States

Affidavit(s) having been made before me by **DEA SPECIAL AGENT ANDREW B. CUNNEY**, who

Affiant

has reason to believe that ☐ on the person of or ■ on the premises known as:

### RESIDENCE OF JENNIFER ROBINSON, LOCATED AT 308 HUMMEL AVENUE, 1ST FLOOR APARTMENT, LEMOYNE, PA 17043, BUILDING MARKED 308.

in the _____ **MIDDLE** _____ District of _____ **PENNSYLVANIA** _____, there is now concealed a certain person or property, namely:

### SEE ATTACHED AFFIDAVIT OF PROBABLE CAUSE.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ October 5, 2003 _____ (not to exceed 10 days)

Date

the person or place named above for the person or property specified, serving this Warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same, leaving a copy of this Warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this Warrant to _____ a U.S. District Court Judge _____ as required by law.

U.S. Judge or Magistrate Judge

_____ September 25, 2003 _____          at     Harrisburg, Pennsylvania _____

Date and Time Issued                                          City and State

William W. Caldwell, U.S. District Judge _____

Name and Title of Judicial Officer

Signature of Judicial Officer

Certified from the record

Date 9/25/03

Mary E. D'Andrea, Clerk

Per _____ Deputy Clerk

-F-

Affidavit for Search Warrant

# United States District Court

_____MIDDLE_____ DISTRICT OF _____PENNSYLVANIA_____

THE MATTER OF THE SEARCH OF THE
RESIDENCE OF JENNIFER ROBINSON,
308 HUMMEL AVENUE, 1ST FLOOR APARTMENT,
LEMOYNE, PA 17043

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

CASE NUMBER: **1:CR-03-251**

**[UNDER SEAL]**

I, __**ANDREW B. CUNNEY**_____, being duly sworn, depose and say:

I am a(n) __**DEA SPECIAL AGENT**__ and have reason to believe that ☐ on the person or ☐ on the
Official Title

premises known as:

**FILED**
HARRISBURG, PA

SEP 25 2003

MAR__, ANDREA, CLERK
Deputy Clerk

**RESIDENCE OF JENNIFER ROBINSON, LOCATED AT 308 HUMMEL AVENUE,
1ST FLOOR APARTMENT, LEMOYNE, PA 17043, BUILDING MARKED 308.**

in the _____MIDDLE_____ District of _____PENNSYLVANIA_____, there is now concealed a certain
person or property, namely:

**SEE ATTACHED AFFIDAVIT OF PROBABLE CAUSE.**

which is:

**PROPERTY THAT CONSTITUTES EVIDENCE OF THE COMMISSION OF A CRIMINAL
OFFENSE; PROPERTY DESIGNED OR INTENDED FOR USE OR WHICH IS OR HAS BEEN
USED AS A MEANS OF COMMITTING A CRIMINAL OFFENSE.**

in violation of Title _21_, United States Code, Section(s) _841(a)(1) and 846_

The facts to support the issuance of a Search Warrant are as follows:

**YOUR AFFIANT, BEING DULY SWORN, DEPOSES AND STATES THE FOLLOWING:**

**THE FACTS TO SUPPORT A FINDING OF PROBABLE CAUSE ARE CONTAINED IN
THE ATTACHED AFFIDAVIT.**

Continued on the attached sheet and made a part hereof.   ■ Yes   ☐ No

Signature of Affiant

Sworn to before me, and subscribed in my presence
____September 25, 2003_____   at   __Harrisburg, Pennsylvania_____
Date                                               City and State

__William W. Caldwell, U.S. District Judge__
Name and Title of Judicial Officer

Signature of Judicial Officer

with Cars on Credit) and Bank Fraud. Count three charged Chad SMITH and SHEPHERD with Aiding and Abetting the Distribution and PWID Controlled Substances. Count four was a forfeiture count for a property that was derived from illegal proceeds. Count five was a forfeiture count for a property that was derived from illegal proceeds. Count six charged MCKINNON with Distribution and PWID of 50 grams and more of crack cocaine.

35. On September 25, 2003, Agents of the DEA located the vehicle known to be used by MCKINNON. While observing the vehicle, SA Kierzkowski observed MCKINNON exit from an apartment located in the vicinity of 308 Hummel Ave., Lemoyne, PA 17043. MCKINNON walked briskly to the aforementioned vehicle carrying a black brief case. MCKINNON entered his vehicle and attempted to depart the area. Agents and officers blocked in MCKINNON's vehicle, at which time MCKINNON rammed the front of one agent's vehicle. During MCKINNON's escape, his vehicle nearly struck SA Keizkowski and DET Hodges, who were both wearing police identifying items. MCKINNON escaped, but later turned himself into agents. The brief case was recovered from another individual with a large sum of cash before MCKINNON turned himself in.

36. While MCKINNON was speeding away, MCKINNON threw a black bag containing an estimated 10 pounds of suspected marijuana.

37. SA Keizkowski interviewed the landlord / manager for of 308 Hummel Ave. and showed her a picture of MCKINNON. She stated that MCKINNON stays in 308 Hummel Ave., 1st floor. She produced a lease for the apartment. A review of the lease showed that the apartment is rented to Jennifer ROBINSON. ROBINSON listed her employer as Cars on Credit and listed her present land lord as "Mike" 220 S. 20th Street, Harrisburg, PA. The landlord stated that MCKINNON actually resided in the apartment at 308 Hummel Ave., 1st floor, and that she confronted ROBINSON about that fact recently.

### Anthony L. Ramsey

38. CI#1 stated Anthony L. Ramsey a/k/a AMP has not had a job as far back as 1997. CI#1 stated Ramsey is the finance man at CARS ON CREDIT INC. CI#1 stated Ramsey provided his drug proceeds to CARS ON CREDIT INC. to finance other drug dealers cars purchased through CARS ON CREDIT INC.

39. CI#2 identified a photograph of Anthony L. Ramsey as an individual named Tony. CI#2 said Tony came to his/her place of business to pick up a car for CHAD SMITH and SHAWN SHEPHERD. CI#2 said that one of his/her employees asked Tony if he had any powder cocaine. Tony said no but pulled out "rock cocaine" from his pocket. CI#2 said no exchange of drugs took place at that time.



**PRIORITY MAIL**®

**UNITED STATES POSTAL SERVICE**

Any amount of mailable material may be enclosed, as long as the envelope is not modified, and the contents are entirely confined within the envelope with the adhesive provided as the means of closure.

**INTERNATIONAL RESTRICTIONS APPLY:**

**4-POUND WEIGHT LIMIT ON INTERNATIONAL APPLIES**

Customs forms are required. Consult the *International Mail Manual* (IMM) at *pe.usps.gov* or ask a retail associate for details.

USPS packaging products have been awarded Cradle to Cradle Certification℠ for their ecologically-intelligent design. For more information go to mbdc.com/usps

Cradle to Cradle Certified℠ is a certification mark of MBDC.

*Please recycle.*

 Recycled Paper



SHIPPING ASSISTANT - LABEL TOTAL: $4.95





U.S. POSTAGE
**$4.95**

33116
Date of sale
02/23/11
02  1P00    09242320

18007550204801

## USPS PRIORITY MAIL®

MICHAEL MCKINNON
REG 27735-083
MEDICAL CENTER/FEDERAL PRISON
PO BOX 4000
SPRINGFIELD MO 65801-4000

SHIP DATE: 2/24/2011
WEIGHT:  1 lb. 0 oz.
Flat Rate Envelope

SHIP
TO:   UNITED STATES DISTRICT COURT
      MIDDLE DISTRICT OF PENNSYLVANIA
      PO BOX 908
      **HARRISBURG PA 17108-0908**



ZIP - e/ USPS DELIVERY CONFIRM

**420 17108 9101 9690 1038 3105 5206 03**

Electronic Rate Approved # 969010386

